UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NOORI SINDY, as Next Friend  )
for J.N.S.,                  )
                             )
              Plaintiff,     )
                             )
         v.                  )      No.  4:05CV1260 FRB
                             )
JO ANNE B. BARNHART,         )
Commissioner of Social Security, )
                             )
              Defendant.     )


**MEMORANDUM AND ORDER**

This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.    All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On  July 17, 2003,  plaintiff Noori  Sindy  filed  an
application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.,
on behalf of his one-year-old son, J.N.S., in which plaintiff
claimed that J.N.S. became disabled on July 1, 2003.  (Tr. 70-73.)
On initial consideration, the Social Security Administration denied
plaintiff's claim for benefits.  (Tr. 27, 49-52.)  On October 5,
2004, a hearing was held before an Administrative Law Judge (ALJ).
(Tr. 14-26.)  Plaintiff testified and was represented by counsel.
J.N.S.'s mother, Gurbat Sindy, was also present at the hearing.  On
December 13, 2004, the ALJ issued a decision denying plaintiff's

claim for benefits.  (Tr. 6-13.)  On June 13, 2005, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 2-4.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the hearing on October 5, 2004, plaintiff testified in response to questions posed by the ALJ and counsel.[1]  Plaintiff testified that he is J.N.S.'s father.  J.N.S.'s date of birth is February 26, 2002.  (Tr. 17-18.)

Plaintiff testified that J.N.S. has difficulty breathing and does not eat well.  (Tr. 18, 22-23.)  Plaintiff testified that J.N.S. must use a breathing machine every five to ten minutes and also uses an inhaler when he has difficulty breathing.  Plaintiff testified that J.N.S.'s condition worsens in the winter and that his mother cannot open a window because the air is bad for him. (Tr. 18.)  Plaintiff testified that J.N.S. has suffered from this condition since his birth.  (Tr. 23.)  Plaintiff also testified that sometimes J.N.S. suffers from a high fever and his condition becomes "very bad."  (Tr. 25.)

Plaintiff testified that J.N.S. sees a physician for his condition and takes medication.  Plaintiff testified that J.N.S. was recently admitted to the emergency room one month prior for ear

---

[1]Because plaintiff's native language was not English, plaintiff was assisted during the administrative hearing by an interpreter, Hana Ismael.

pain and breathing difficulty. (Tr. 19-20, 23.) Plaintiff testified that J.N.S. was scheduled for a follow up appointment later in the month. (Tr. 20.)

Plaintiff testified that J.N.S. can walk but that he tires quickly. (Tr. 21-22.) Plaintiff testified that J.N.S. has difficulty speaking because of pain in his chest and his difficulty with breathing. (Tr. 21.) Plaintiff testified that J.N.S. has no difficulty in holding and handling things. (Tr. 22.) Plaintiff testified that J.N.S. cries a lot but no more than his four other children when they were of the same age. (Tr. 23-24.)

### III. Medical Records

J.N.S. was born on February 26, 2002. Physical examination by Dr. Mona Yassin the following day was normal. (Tr. 209-10.) Follow up examination at ten days old was normal. (Tr. 207-08.)

J.N.S. was taken to Dr. Yassin on March 11, 2002. He had a fever of 102 degrees, was coughing and had a decreased appetite. Examination of J.N.S.'s chest and lungs showed coarse breath sounds with wheezing, rales and grunting. Dr. Yassin diagnosed J.N.S. with respiratory distress and pneumonia and referred J.N.S. to St. Louis Children's Hospital for evaluation and admission. (Tr. 206.)

J.N.S. was admitted to the emergency room at Children's Hospital on March 11, 2002. (Tr. 177.) J.N.S. failed to respond to Albuterol nebulizer in the emergency room. (Tr. 165.) It was

determined to admit J.N.S. to the hospital and to administer intravenous antibiotics and rule out sepsis. (Tr. 165, 177.) Chest x-rays taken that same date showed focal infiltrates involving the left upper lobe/lingula and especially focally in the right upper lobe. No pleural effusion was noted. (Tr. 180.) Laboratory results were positive for respiratory syncytial virus (RSV). (Tr. 171, 174.) On March 14, 2002, J.N.S. had an acute episode of increased respiratory distress. Chest x-rays showed a worsening of the right upper lobe opacity. (Tr. 137, 166.) Antibiotic treatment was continued with improvement. J.N.S. was slowly weaned off oxygen on March 21, 2002, and he was able remain on room air for twenty-four hours with an oxygen saturation level above ninety-two percent. (Tr. 132-36, 165-67.) J.N.S. was discharged on March 22, 2002, in good condition. Upon discharge, J.N.S. was diagnosed with RSV bronchiolitis, secondary bacterial pneumonia, and dehydration (resolved). J.N.S.'s discharge medications were Augmentin and Albuterol nebulizer to be administered every four hours as needed. (Tr. 165-67.)

J.N.S. returned to Dr. Yassin on March 25, 2002, for follow up of his hospital admission. Mrs. Sindy reported that J.N.S. no longer coughed and was eating well. Physical examination was normal. (Tr. 205.)

J.N.S. returned to Dr. Yassin on April 18, 2002. Physical examination of the chest and lungs showed very fine

wheezing with auscultation.  No refractions or flaring was were present.  Dr. Yassin refilled Nystatin and prescribed Albuterol for a nebulizer to be administered every eight to twelve hours.  (Tr. 204.)

Mrs. Sindy took J.N.S. to Dr. Yassin on July 3, 2002, and reported that J.N.S. was coughing, had a fever and congestion, and was pulling at his ears.  Mrs. Sindy reported that they had just returned from overseas and that J.N.S. was now fussy and was experiencing vomiting and diarrhea.  Upon physical examination, Dr. Yassin diagnosed J.N.S. with upper respiratory infection, acute gastroenteritis, acute otitis media, and wheezing.  J.N.S. was prescribed Amoxil and Mrs. Sindy was instructed to resume the Albuterol nebulizer every six to eight hours.  Dr. Yassin instructed that J.N.S. return in two weeks for ear recheck and immunizations.  (Tr. 202.)

J.N.S. returned to Dr. Yassin on July 16, 2002, for his four-month well child examination.  Examination of the ears showed no improvement.  Examination of the chest and lungs was normal.  It was noted that Mrs. Sindy had not been giving J.N.S. the antibiotic as prescribed.  Mrs. Sindy was instructed to finish the ten-day course of antibiotics.  Mrs. Sindy was also instructed to continue J.N.S. on Albuterol as needed.  (Tr. 200-01.)

On August 16, 2002, Dr. Yassin examined J.N.S. for his six-month well child examination.  Mrs. Sindy expressed no concerns

and Dr. Yassin noted J.N.S. to be well.  Physical examination was normal.  J.N.S.'s physical development and behavior were noted to be "OK."  (Tr. 198-99.)

Mrs. Sindy took J.N.S. to Dr. Yassin on September 24, 2002, with complaints of cough and fever.  Upon physical examination, Dr. Yassin diagnosed J.N.S. with wheezing and acute otitis media.  Mrs. Sindy was instructed to resume the Albuterol nebulizer every six to eight hours and to give J.N.S. fluids and Tylenol for fever.  Amoxil was prescribed.  (Tr. 197.)

Mrs. Sindy took J.N.S. Dr. Yassin on October 17, 2002, with complaints of fever, congestion and coughing.  Physical examination was normal.  Dr. Yassin continued in her diagnosis of acute otitis media.  Mrs. Sindy was instructed to resume the Albuterol nebulizer, and Augmentin was prescribed.  (Tr. 196.)

J.N.S. returned to Dr. Yassin on November 12, 2002.  Mrs. Sindy reported that J.N.S. had a fever and was crying a lot. Examination of the ears showed infection.  Examination of the chest and lungs was normal.  Dr. Yassin continued in her diagnosis of acute otitis media and Septra was prescribed.  (Tr. 195.)

J.N.S. was administered a flu shot at Dr. Yassin's office on November 21, 2002.  Dr. Yassin noted J.N.S. appeared to be okay. (Tr. 194.)

Mrs. Sindy returned to Dr. Yassin on December 12, 2002, with complaints of fever and congestion and that J.N.S. was pulling

on his ears.  Examination of the ears showed continued infection.
Examination of the chest and lungs was normal.  Dr. Yassin
diagnosed J.N.S. with acute otitis media and upper respiratory
infection.  Septra and Histex were prescribed.  J.N.S.'s
prescription for Nystatin was refilled.  (Tr. 193.)

J.N.S. returned to Dr. Yassin on January 14, 2003, for
his nine-month well child examination.  J.N.S.'s physical
development and behavior were noted to be "OK."  There continued to
be infection in both ears.  Examination of the chest and lungs was
normal.  Dr. Yassin diagnosed J.N.S. with acute otitis media and
prescribed Amoxil.  (Tr. 191-92.)

On February 5, 2003, Mrs. Sindy returned to Dr. Yassin
with J.N.S. questioning whether J.N.S. continued to have an ear
infection.  Examination of the ears showed old blood in the left
ear canal and continued infection.  Examination of the chest and
lungs was normal.  J.N.S. was diagnosed with upper respiratory
infection and acute otitis media.  Augmentin was prescribed.  On
March 4, 2003, it is noted that a refill was ordered for Albuterol
to be administered every four to six hours.  (Tr. 190.)

Mrs. Sindy took J.N.S. to Dr. Yassin on March 7, 2003,
with complaints of fever, cough, wheeze, and pulling at the ears.
Examination of the ears showed infection.  Examination of the chest
showed coarse breath sounds bilaterally, with no rales, but with
faint wheezing.  J.N.S. was diagnosed with reactive airway disease,

acute otitis media, and upper respiratory infection.  J.N.S. was prescribed Orapred and Omnicef.  Mrs. Sindy was instructed to administer the Albuterol nebulizer every six to eight hours.  (Tr. 189.)

J.N.S. returned to Dr. Yassin on April 14, 2003.  Mrs. Sindy reported that J.N.S. had diarrhea and was vomiting.  Mrs. Sindy also reported that J.N.S. had a fever.  Examination showed J.N.S.'s left ear to be dull.  Examination of the chest and lungs was normal.  J.N.S. was diagnosed with recurrent otitis media and gastroenteritis.  Septra was prescribed.  (Tr. 188.)

Dr. Yassin conducted J.N.S.'s one-year well child examination on May 8, 2003.  Mrs. Sindy reported J.N.S. to continue to tug at his ears.  J.N.S.'s physical development and behavior were noted to be okay.  Physical examination showed continued ear infection.  Examination of the chest and lungs was normal.  J.N.S. was diagnosed with recurrent otitis media.  (Tr. 186-87.)

J.N.S. was admitted to the emergency room at Children's Hospital on July 12, 2003, for fever, cough and increased wheezing.  (Tr. 149.)  It was reported that J.N.S.'s activity had decreased and that Albuterol treatments were providing no relief.  (Tr. 149.)  Chest x-rays showed the lungs to be mildly hyperinflated with mild bilateral perihilar infiltrate, more marked on the right.  (Tr. 157.)  J.N.S. was administered Albuterol treatments and steroid therapy with limited improvement.  (Tr. 153.)  J.N.S. was admitted

to the hospital for further treatment and evaluation, with initial diagnoses of asthma exacerbation and bilateral acute otitis media. (Tr. 149, 153.)  On July 13, 2002, examination of the lungs showed good aeration without significant wheezing. (Tr. 155.)  J.N.S. was discharged later that day on a short course of steroid treatment, with consideration as to whether to begin inhaled steroid treatment as well.  (Tr. 148, 155.)  Upon J.N.S.'s discharge, Mr. Sindy was instructed to administer the Albuterol nebulizer to J.N.S. every fours until he could be seen by Dr. Yassin; to administer Pulmicort nebulizer twice a day; and to give J.N.S. Orapred and Amoxicillin. (Tr. 148.)

Dr. Yassin examined J.N.S. on July 15, 2003, for follow up of his recent hospitalization for reactive airway disease.  It was noted that J.N.S. was placed on Orapred and Albuterol nebulizer every four hours.  It was also noted that J.N.S. was given Pulmicort and was prescribed Foramoxil for ear infection.  Physical examination showed continued ear infection.  Examination of the chest and lungs showed fair upper congestion.  J.N.S. was diagnosed with reactive airway disease.  Mrs. Sindy was instructed to continue with Albuterol nebulizer every six to eight hours and to administer Pulmicort twice a day after completing a three-day course of Orapred.  Dr. Yassin further instructed Mrs. Sindy to complete the ten-day course of Amoxil.  (Tr. 185.)

In a Function Report completed by plaintiff for

disability determinations on July 15, 2003 (Tr. 94-99), plaintiff reported that J.N.S. was not totally unable to talk and did not have problems talking. (Tr. 95.) Completing categories relating to J.N.S.'s specific abilities and limitations, plaintiff reported that J.N.S. was unable to perform some aspects of self care nor was able to engage in certain physical activities (Tr. 97-98), and further reported that he was unsure whether J.N.S. had difficulty understanding and learning (Tr. 96), noting that "[t]he baby is only one and [a] half years old [and] can't do most of the thangs [sic] in this Section." (Tr. 99.)

On July 29, 2003, plaintiff completed a Daily Activities Report for disability determinations (Tr. 79-82)[2] in which he reported that J.N.S. could not say words other than "Mama/Dada." Plaintiff reported that J.N.S. understands when he is asked to stop doing something or is asked to do something. (Tr. 81.) Plaintiff reported that he has problems understanding J.N.S.'s speech because "he doesn't speak well yet." (Tr. 82.)

On August 4, 2003, Dr. Yassin completed a physician's questionnaire for disability determinations. (Tr. 182-83.) Dr. Yassin reported that J.N.S. was most recently seen in the emergency room for an asthma attack with wheezing. Dr. Yassin reported J.N.S. to have been diagnosed with reactive airway disease as evidenced by wheezing with rales and rhonchi. Dr. Yassin reported

_____

[2]J.N.S. was seventeen months old at the time this Report was completed.

the onset of J.N.S.'s condition to be the winter of 2002 and that J.N.S.'s response to treatment was "very good." Dr. Yassin reported that J.N.S. has an at-home nebulizer to use as needed for acute attacks. (Tr. 182.) With respect to J.N.S.'s development in the areas of gross motor, fine motor, social, and language skills, Dr. Yassin reported that J.N.S. was meeting the milestones developmentally. (Tr. 182-83.)

On August 12, 2003, plaintiff completed a Daily Activities Report for disability determinations (Tr. 75-78)[3] in which he reported that J.N.S. could not say words other than "Mama/Dada." Plaintiff reported that J.N.S. does not understand everything but understands commands such as "stop," "sit," "stand," "eat," and "drink." Plaintiff reported that J.N.S. listens to adults and does what his parents ask him to do. (Tr. 77.) Plaintiff reported that J.N.S. sometimes cries and plaintiff does not know what he needs. Plaintiff also reported that other people have a difficult time understanding J.N.S.'s speech. (Tr. 78.)

On August 26, 2003, J.N.S. underwent bilateral myringotomy with tube insertion at Children's Hospital for chronic otitis media. (Tr. 121-23.)

Mrs. Sindy took J.N.S. to Dr. Yassin on September 22, 2003, for asthma exacerbation and fever. Dr. Yassin noted J.N.S.'s left ear to be draining. Examination of the ears showed fluid in

---

[3]J.N.S. was just under eighteen months old at the time this Report was completed.

the left ear canal and Dr. Yassin could not see the myringotomy tube. Dr. Yassin detected wheezing bilaterally but no rales upon examination of the chest and lungs. Dr. Yassin diagnosed J.N.S. with wheezing, otitis externa and acute otitis media. Dr. Yassin spoke at length with the interpreter that the Albuterol nebulizer needs to be administered right away whenever J.N.S. starts to have wheezing and that her office needs to be notified of such events. Dr. Yassin instructed that otherwise, the nebulizer is to be used every four to six hours. Dr. Yassin further instructed that use of the Pulmicort nebulizer must continue twice a day. J.N.S. was prescribed Augmentin and Cortisporin ear drops. (Tr. 118.)

On November 17, 2003, Mrs. Sindy returned to Dr. Yassin with J.N.S. and continued to report ear drainage. Examination showed J.N.S.'s left ear to be full with seropurulent fluid. Examination of the chest and lungs was normal. J.N.S. was diagnosed with acute otitis media, ororrhea, and otitis externa. Floxin otic ear drops and Augmentin were prescribed. (Tr. 117.)

On March 31, 2004, Dr. Yassin examined J.N.S. for his two-year well child examination. (Tr. 127-28.) Mrs. Sindy expressed no concerns. Dr. Yassin noted J.N.S.'s development in language, fine and gross motor skills, and behavior to be okay. (Tr. 127.) Physical examination showed the myringotomy tube in the left ear to be loose. Examination of the chest and lungs was normal. (Tr. 128.)

On June 14, 2004, J.N.S. underwent a consultative examination for disability determinations. (Tr. 141-45.) Dr. Diane M. Rup reviewed J.N.S.'s medical history. Dr. Rup noted J.N.S. to be a Kurdish child and to be present at the examination with his father and an interpreter. Dr. Rup noted J.N.S. to live at home with his parents and four siblings. Mr. Sindy reported that J.N.S. began walking between six and eight months of age. Dr. Rup noted that, by report, J.N.S. said only "mamma" and "dada" and nothing else. (Tr. 141.) Mr. Sindy reported that J.N.S. wheezes whenever he is out in cold weather and that he has problems breathing when he runs or plays for three or four minutes. Dr. Rup noted J.N.S. to be very fearful of the examination and that he was crying and did not want to get off of his father's lap, thus preventing Dr. Rup from engaging him to perform fine motor exercises. (Tr. 142.) Examination of the lungs showed J.N.S. to have good aeration. Dr. Rup did not detect any wheezes, rales or rhonchi, and J.N.S. was in no respiratory or other distress. (Tr. 142, 143.) On the Denver Exam, Dr. Rup noted J.N.S. not to be able to remove a garment and unable to put on clothing, opining that J.N.S. was delayed. Dr. Rup noted J.N.S. to be able to use a spoon but not a fork sometimes. As to gross motor skills, Dr. Rup noted J.N.S. to be able to walk and run but unable to walk up steps. With respect to language, Dr. Rup noted, "By history he says mamma and dada and no other words which is very severely delayed. They

state they have talked to the pediatrician about it but the pediatrician supposedly said that he would talk later." (Tr. 143.)

J.N.S. was admitted to the emergency room at Children's Hospital on August 4, 2004, with complaints of right ear pain, cough and fever. J.N.S.'s history of asthma was noted as well as J.N.S.'s home treatment with Albuterol. (Tr. 116.) J.N.S. was discharged that same date with Amoxicillin and Floxin otic ear drops. (Tr. 113.)

On August 7, 2004, Dr. Yassin examined J.N.S. and noted Mrs. Sindy to express no concerns. Mrs. Sindy reported to have taken J.N.S. to the emergency room for ear drainage. Examination of the ears showed the myringotomy tube positioned in the left ear canal. Dr. Yassin could not see the tube in the right ear and noted blood-tinged fluid from the ear canal. Examination of the chest and lungs was normal. J.N.S. was diagnosed with otorrhea and acute otitis media. Mrs. Sindy was instructed to finish the prescribed course of Amoxil and Floxin otic drops. (Tr. 112.)

## IV. The ALJ's Decision

The ALJ found J.N.S. not to have engaged in substantial gainful activity. The ALJ found J.N.S. to have asthma but that J.N.S. did not have an impairment or combination of impairments which met or medically equaled the severity of any impairment listed in Part B of Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff to be credible, but that the information

provided was not sufficient to support a finding that J.N.S. functionally met the listings. The ALJ determined J.N.S.'s impairment or combination of impairments not to result in marked and severe functional limitations or which are functionally equivalent to the requirements of a listing within the listing of impairments of Part B of Appendix 1, Subpart P, Regulations No. 4. The ALJ thus determined J.N.S. not to be under a disability at any time through the date of the decision. (Tr. 12.)

## V. Discussion

A claimant under the age of eighteen is considered disabled and eligible for Supplemental Security Income under the Social Security Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits. First, the Commissioner must determine whether the child is engaged in substantial gainful activity. If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe. Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or

functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the regulations. 20 C.F.R. § 416.924(a). If the impairment(s) meets or medically equals a Listing, the child is disabled. If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings. 20 C.F.R. § 416.926a.

Functional equivalence is measured in several ways. If the child's condition results in extreme limitations in one or more specific functions which are described as criteria for disability in the listed impairments, the child will be found to be disabled. 20 C.F.R. § 416.926a(b)(1). In addition, if a child's condition results in "extreme" limitation of functioning in one broad area of functioning, or "marked" limitation of functioning in two broad areas of functioning, the child will be found to be disabled. 20 C.F.R. § 416.926a(b)(2). If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled. Oberts o/b/o Oberts v. Halter, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Young v. Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf

<u>v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. <u>Id.</u> Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Id.</u>

In this cause, plaintiff raises no issue relating to the Commissioner's determination that J.N.S.'s impairment does not meet or medically equal a listed impairment. Instead, plaintiff argues that the Commissioner's determination that J.N.S.'s impairment does not functionally equal a listed impairment is not supported by sub-stantial evidence. Specifically, plaintiff argues that the ALJ failed to consider all the evidence of record, and specifically. evidence from lay witnesses and Dr. Rup, which shows J.N.S. to suffer from developmental delays which functionally equal a Listing. For the following reasons, plaintiff's claim should be denied.

As set out above, when a child's severe impairments are determined not to meet or medically equal a Listing, the Commissioner is required to determine whether and to what extent

the child's impairments affect broad areas of functioning as defined by the Regulations, and thus whether such impairments functionally equal a Listing. To "functionally equal the Listings," the impairment must be of Listing-level severity, <u>i.e.</u>, it must result in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making such a determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. <u>Id.</u> As such, to be determined disabled, a child-claimant must have an "extreme" limitation in one domain or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a).

Pursuant to 20 C.F.R. § 416.926a(e)(2)(i), a child-claimant has a "marked" limitation in a domain when his

> impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities. [His] day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i).

For children under the age of three, a "marked" limitation will generally be found if the child is "functioning at a level that is more than one-half but not more than two-thirds of [the child's] chronological age[.]" 20 C.F.R. § 416.926a(2)(ii). A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner reviews all the evidence of record and "compare[s] [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); <u>see also</u> 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have impairments.").

As an initial matter, the undersigned notes that plaintiff relies on interim rules set out in 20 C.F.R. § 416.926a (1996) as enacted pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 in arguing that J.N.S.'s limitations functionally equal the listings. For child-claimants between the ages of one and three, § 416.926a (1996) required the

Commissioner to consider their limitations in three broad areas of functioning: 1) Cognitive/Communication, 2) Motor Development and 3) Social Development. However, the final rules, which became effective January 2, 2001, and apply in this case, extensively reorganized and revised 20 C.F.R. § 416.926a. See Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 650-51 (8th Cir. 2004) (citing 65 Fed. Reg. 54,752 (Sept. 11, 2000)). Under the final rules, the broad areas of functioning pertaining to functional equivalence are those six areas as set out above, namely: 1) Acquiring and Using Information, 2) Attending and Completing Tasks, 3) Interacting and Relating with Others, 4) Moving About and Manipulating Objects, 5) Caring for Oneself, and 6) Health and Physical Well-Being. Garrett, 366 F.3d at 651; 20 C.F.R. § 416.926a (2003). It was J.N.S.'s limitations in these six broad areas of functioning which the ALJ in the instant case reviewed to determine whether J.N.S.'s impairment functionally equaled a listed impairment. (Tr. 11.)

A review of the ALJ's decision in this cause shows him to have summarized all the evidence of record, including medical evidence obtained from Children's Hospital, Dr. Yassin and Dr. Rup, as well as lay evidence, and concluded that J.N.S. suffered less than marked limitations in the domains of Acquiring and Using Information, and Health and Physical Well-Being; and no limitations in the remaining four domains. Plaintiff argues, however, that Dr. Rup's opinion that J.N.S.'s language development was "very severely

delayed" shows an extreme limitation. The ALJ acknowledged Dr. Rup's opinion but noted that Dr. Rup's unfamiliarity with the Kurdish culture and the fact that J.N.S.'s home is not an English-speaking home may likely account for Dr. Rup's opinion that J.N.S.'s delay in language development constituted a severe limitation. (Tr. 11.) While Dr. Rup's consultative opinion may support of a finding of a marked or extreme limitation in the domain of Acquiring and Using Information, this opinion alone is insufficient to make such a finding inasmuch as there exists substantial evidence on the record as whole, as discussed by the ALJ, to find that J.N.S. is not so limited.

The Regulations require the Commissioner to give more weight to the opinions of treating physicians than other sources. 20 C.F.R. § 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. <u>Id.</u> This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from

> reports of individual examinations, such as consultative examinations or brief hospitalizations.

Id.

As such, evidence received from a treating physician is generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians. See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991).

With respect to the opinions of one-time consulting physicians, such opinions are generally not considered to be substantial evidence, "especially if the treating physician contradicts the consulting physician's opinion." Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). Where there exists such a contradiction between the opinions of a one-time consultant and a treating physician, the ALJ must resolve the conflict between those opinions. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). An ALJ may credit a one-time consultant and discount a treating physician's opinion "(1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Anderson v. Barnhart, 344 F.3d 809, 812-13 (8th Cir. 2003) (internal citation and quotation marks omitted). A review of the record shows neither of these factors to be present here.

In addition to her care and treatment of J.N.S.'s acute health conditions, treating physician Dr. Yassin conducted routine well child examinations of J.N.S. and continually opined therein that J.N.S.'s relevant development was okay. In a physician's questionnaire completed in August 2003, Dr. Yassin specifically reported that J.N.S. was meeting the developmental milestones in language development. No inconsistencies appear in this opinion or in Dr. Yassin's treatment notes which would render such opinion not credible. Further, the record does not show Dr. Rup's contrary opinion to have been based on any better or more thorough medical evidence than that of Dr. Yassin. Indeed, the undersigned notes that Dr. Rup noted J.N.S. to be fearful of the consultative examination and noncompliant with her efforts due to such fear.

A consideration of the lay evidence likewise supports the ALJ's finding that J.N.S. does not suffer an extreme or marked limitation in the domain of Acquiring and Using Information. While plaintiff reported to Dr. Rup in June 2004 that J.N.S. said no words other than "mama" and "dada," the record shows plaintiff to have made this same report less than one year prior and also to have reported at that time that J.N.S., at eighteen months of age, understood commands such as "stop," "sit," "stand," "eat," and "drink"; listened to adults; and did what his parents asked him to do. Plaintiff further reported at that time that J.N.S. understood when he was asked to stop doing something or was asked to do

something.

Accordingly, contrary to plaintiff's assertion, a review of the medical evidence of record, coupled with the lay evidence of record, shows there to be substantial evidence on the record as a whole to find that, at J.N.S's age, his ability to acquire and use information was less than marked. <u>See</u> 20 C.F.R. §§ 416.926a(e)(2)(ii), 416.926a(g). Although Dr. Rup opined that J.N.S. suffered severe language delays, substantial evidence on the record as a whole nevertheless supports the ALJ's conclusion that J.N.S.'s limitation is not such that it should be determined to be more than "less than marked." <u>See</u> <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005) (may not reverse merely because substantial evidence may support different outcome).

## VI. Conclusion

For the reasons set out above on the claim raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claim of error should be denied. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. <u>Neal ex rel. Walker</u>, 405 F.3d at 688; <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001). Because there is substantial evidence on the record as a whole to support the ALJ's decision, the

Commissioner's determination that J.N.S. is not disabled should be affirmed.

      Therefore, for all of the foregoing reasons,

      **IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

      Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this _20th_ day of September, 2006.